## COMMONWEALTH *vs.* MICHAEL DePEIZA.

No. 06-P-356.

Suffolk. April 4, 2006. - June 2, 2006.

Present: RAPOZA, BROWN, & GRASSO, JJ.

Further appellate review granted, 447 Mass. 1105 (2006).

*Practice, Criminal,* Motion to suppress. *Search and Seizure,* Threshold police inquiry, Protective frisk. *Threshold Police Inquiry. Constitutional Law,* Search and seizure, Reasonable suspicion, Investigatory stop. *Firearms.*

A trial court judge erred in denying a criminal defendant's motion to suppress a handgun seized by police officers during a stop and patfrisk of the defendant, where the defendant's walk, coupled with his subsequent actions (exhibiting nervousness; avoiding eye contact; shifting from side to side; and shielding his right jacket pocket, which contained a heavy object, from the officers' view) created neither a reasonable suspicion of criminal activity [401-406] nor a reasonable apprehension of danger [406-408] to justify the stop, frisk, and seizure. BROWN, J., concurring. RAPOZA, J., dissenting.

COMPLAINT received and sworn to in the Boston Municipal Court Department on April 27, 2005.

A pretrial motion to suppress evidence was heard by *Robert N. Tochka,* J., and the case was heard by *E. Sydney Hanlon,* J.

*Robert E. Fox* for the defendant.

*Paul B. Linn,* Assistant District Attorney, for the Commonwealth.

GRASSO, J. At issue is the propriety of a stop and patfrisk of the defendant. On appeal from his convictions of illegal possession of a firearm and ammunition, the defendant maintains that the motion judge erred in denying his motion to suppress the loaded handgun found by the police. We conclude that the stop, frisk, and seizure exceeded constitutional bounds.

1. *Facts.* We take the facts from the motion judge's findings

and the undisputed testimony.[1] See *Commonwealth* v. *Hinds*, 437 Mass. 54, 55 (2002), cert. denied, 537 U.S. 1205 (2003). Shortly after midnight on April 27, 2005, Officers John Conway and Dean Bickerton of the Boston police department were riding in an unmarked Ford Crown Victoria automobile in the vicinity of Babson and Delhi Streets in the Dorchester section of Boston. That locale is a "high crime" area where, on past occasions, shots had been fired and arrests had been made involving illegal handguns.

Conway and Bickerton had three years' experience each. Their prior police academy training included consideration of the ways in which individuals conceal and transport firearms. One such method — the straight arm method — employs a straightened arm pressed against the concealed weapon. Ten to fifteen percent of their twenty-five gun arrests in the previous eight months involved an initial observation of this method of carrying the firearm.

As Bickerton drove along Delhi Street, he and Conway observed the defendant walking along the sidewalk and talking on his cellular telephone, which he held in his left hand. The defendant's right arm was rigid, not moving, and pressed to his side as if he were holding something. Believing that the defendant's manner of walking warranted investigation, the officers turned the car around. As they approached the defendant, who was now on Babson Street, they observed that he continued to walk favoring his right side.

Without activating the vehicle's blue lights or siren, Bickerton pulled the vehicle alongside the defendant[2] and hailed him by a name chosen at random.[3] Through the driver's side window, Bickerton asked the defendant if he was from the area, where he was coming from, and where he was going. The officers, who were dressed in plain clothes with badges displayed at

---

[1]The judge heard from the two arresting police officers and the defendant.

[2]It is unclear from the testimony or from the judge's findings whether the vehicle was on the wrong side of the road and across the street from the defendant or next to him. The difference is inconsequential. See *Commonwealth* v. *Rock*, 429 Mass. 609, 612 (1999) (driving unmarked cruiser on wrong side of one-way street not a stop).

[3]The defendant testified that the officers yelled to him, "Yo, Dwayne." The officers did not know the defendant; they addressed him by name in order to get closer to him.

chest level, noticed that the defendant was attempting to shield his right side from their view "as if trying to hide something." He avoided eye contact, looked left and right, and shifted his weight from side to side.

Concerned that the defendant was about to run, Bickerton stepped out of the car and approached him. The defendant told the officers that he lived in New York, but was staying with his family at an apartment on Delhi Street.[4] To dispel the mistaken belief that he was "Dwayne," the defendant reached into his right pants pocket and produced identification, which he gave to Bickerton, who was an arm's length away.[5] Conway then ran the identifying information through the vehicle's mobile computer with negative results for warrants or incriminating information.

As the defendant reached into his right pants pocket for identification, the officers noted that he continued to turn his right side from their view. They also observed that the right pocket of his jacket was tilted to the side, as if it held a heavy object — heavier than a cellular telephone, wallet, or pack of cigarettes. Believing that the defendant's jacket contained a firearm, Bickerton told the defendant that he intended to conduct a patfrisk.[6] As Bickerton moved to frisk him, the defendant moved back to avoid being frisked. The officers told the defendant that they wanted to conduct a patfrisk for his safety as well as their own, and Bickerton again moved towards him. As the defendant again attempted to move away, Bickerton

---

[4]The defendant worked in New York in customer service and as a teller, but his parents and brother had an apartment on Delhi Street.

[5]The defendant confirmed that he provided his New York state driver's license to Bickerton voluntarily. He stated that he also provided a second form of identification, his student identification card from Berkeley College in New York.

[6]The uncontested testimony was that the officers did not ask the defendant whether he had a firearm until *after* they told him that they were going to conduct a patfrisk. The judge made no explicit factual findings concerning the chronology of the frisk and the officers' inquiry. See *Commonwealth* v. *Ciaramitaro*, 51 Mass. App. Ct. 638, 642 (2001) (emphasizing fact intensive and time dependent nature of search and seizure analysis).

The officers and the defendant dispute whether in response to that question the defendant replied, "I wouldn't blast you all," a point on which the judge also made no factual finding. Because the frisk preceded the inquiry regarding the firearm, the defendant's response, if any, is not material to our analysis.

grabbed the defendant's right jacket pocket and felt the handle of a handgun. He reached into the defendant's pocket and seized the gun.[7]

2. *Discussion.* Assessment of witness credibility is the province of the motion judge. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited; *Commonwealth* v. *Gutierrez*, 26 Mass. App. Ct. 42, 47 (1988). We accept the judge's subsidiary findings of fact absent clear error, but conduct an independent review of his ultimate findings and conclusions of law. See *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

We conclude that the judge erred in his application of law to the facts found. See *Commonwealth* v. *Vesna San*, 63 Mass. App. Ct. 189, 190 (2005). Whether viewed from the standpoint of reasonable suspicion of criminal activity or that of reasonable apprehension of danger, the stop and immediate patfrisk of the defendant is not constitutionally supportable.[8]

a. *Reasonable suspicion of criminal activity.* A field encounter is not a constitutional stop. See *Commonwealth* v. *Stoute*, 422 Mass. 782, 785-789 (1996). "[O]fficers may make inquiry of anyone they wish and knock on any door, so long as they do not implicitly or explicitly assert that the person inquired of is not free to ignore their inquiries." *Commonwealth* v. *Murdough*, 428 Mass. 760, 763 (1999). At the same time, a tenuous balance exists between mere encounters and unconstitutional conduct. Citizens do not expect that police officers, whether handling routine traffic violations or engaging in casual street encounters, "will engage, in the absence of justification, in stalling tactics, obfuscation, [or] strained conversation" in the hope that sooner or later evidence of an arrestable offense will

---

[7]The defendant told the officers that he was not licensed to possess a firearm.

[8]The motion judge's legal determination appears to rest primarily on a reasonable apprehension of danger, but includes the alternative view that the defendant's actions were "inconsistent with legal possession."

turn up. *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 663 (1999). From a citizen's perspective such encounters may be rightfully viewed as nothing more than an arrogant and unnecessary approach to the constitutional line. Such encounters "may also pose unique hardships on minorities who, it has been argued, are often the subject of stops on pretext." *Ibid.*

Here, the officers' initial interaction with the defendant approached, but did not exceed, the boundary of a stop within the meaning of the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights. Compare *California* v. *Hodari D.*, 499 U.S. 621, 624-626 (1991) (stop occurs for Fourth Amendment purposes when police apply force or make show of authority to which subject yields); *Commonwealth* v. *Stoute*, 422 Mass. at 785-789 (adopting "free to leave" standard of *United States* v. *Mendenhall*, 446 U.S. 544, 554 [1980], for art. 14 purposes). The officers did not employ the talismans of blue lights, flashers, or sirens, or use words of command to cause the defendant to stop walking. See *Commonwealth* v. *Grandison*, 433 Mass. 135, 138 (2001). Their tone was conversational, not authoritative; they employed no weapons or other indicia of authority from which, at least as a matter of constitutional analysis, a reasonable person would not feel free to leave the encounter. See *Commonwealth* v. *Rock*, 429 Mass. 609, 612 (1999) (officer's intent to stop defendant not relevant to "free to leave" analysis, absent outward manifestation of that intent). Compare *Commonwealth* v. *Barros*, 435 Mass. 171, 174-176 (2001) (officer's second request to stop had "compulsory dimension" that first did not).

The Commonwealth concedes, correctly, that a stop for art. 14 purposes occurred when the officers declared their intent to frisk the defendant, as he was then no longer free to leave. See *ibid.* Contrary to the Commonwealth, however, we conclude that at that point of constitutional moment, the officers lacked reasonable suspicion that the defendant might be engaged in criminal activity. At that time, there was no objective factual basis for concluding that the defendant possessed a firearm, much less an unlicensed one. See *id.* at 177.

Prior to encountering the defendant, the officers had neither observed nor received any report of criminal activity, a firearm

being brandished, or shots being fired. Compare *Commonwealth v. Fraser*, 410 Mass. 541, 546 (1991); *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 676-677 (2000); *Commonwealth* v. *Johnson*, 49 Mass. App. Ct. 273, 275 (2000). That the defendant was walking in an area not unfamiliar with firearm violence is a factor in assessing reasonable suspicion of criminal activity. "But this factor must be considered with some caution because many honest, law-abiding citizens live and work in high-crime areas. These citizens are entitled to the protections of the Federal and State Constitutions, despite the character of the area." *Commonwealth* v. *Holley*, 52 Mass. App. Ct. 659, 663 (2001). The officers had no prior knowledge of, or dealings with, the defendant that would provide a basis for ascribing criminality to his actions. His activities do not take on a sinister cast merely because the street on which he is walking is located in Dorchester. See *Commonwealth* v. *Cheek*, 413 Mass. 492, 496-497 (1992) (problems facing " 'high crime area' will not be resolved any more readily by excluding the individuals who live there from the protections afforded by our Constitution").

What the case for singling out this defendant hinges on is the manner in which he was walking — with an arm rigid and pressed against his right side. The Commonwealth contends that the officers' training and experience provided a basis for believing criminal activity was afoot because the defendant's manner of walking was characteristic of that employed by people who carry concealed firearms illegally. According to the Commonwealth, the defendant's walk, coupled with his subsequent nervousness, avoiding of eye contact, shifting from side to side, and shielding of his right jacket pocket (which contained a heavy object) from the officers' view, created a reasonable suspicion that he was carrying a concealed firearm and was not licensed to do so. We disagree.

We acknowledge that an officer's training and experience can be an important factor. See *Commonwealth* v. *Kennedy*, 426 Mass. 703, 706 (1998); *Commonwealth* v. *Peters*, 48 Mass. App. Ct. 15, 17-18 (1999). We are unpersuaded, however, that the manner of the defendant's walk, even in conjunction with the other cited factors, provided an objective factual basis for a reasonable suspicion that the defendant was engaged in criminal

activity (or, as discussed *infra*, posed a danger). The observed activity, walking with an arm pressed closely to the side, is fundamentally different from that described in *Kennedy* as fitting a "pattern" or "archetype" consistent with a "classic street level drug transaction." Notably absent here, but present in *Kennedy*, is prior knowledge of previous involvement in the criminal conduct at issue, thereby providing context for viewing with a skeptical eye what might otherwise appear to be innocuous conduct. *Commonwealth* v. *Kennedy, supra* at 706-707. So too, in *Commonwealth* v. *Watson*, 430 Mass. 725, 729-731 (2000), cited by the dissent, *post* at 409, the defendant's association with an individual whose actions satisfied the indicators for a drug dealer provided the critical context for ascribing criminality to a number of seemingly innocent activities.

An individual's manner of walking, like his hairstyle or clothing, is by itself too idiosyncratic to serve as the basis for a reasonable suspicion of criminal activity. See *Commonwealth* v. *Heon*, 44 Mass. App. Ct. 254, 256 (1998). Absent context for characterizing the defendant's action as bearing a criminal cast, there are too many innocent explanations to permit idiosyncracy to serve as the critical identifier of criminal conduct. See *Commonwealth* v. *Houle*, 35 Mass. App. Ct. 474, 476-477 (1993) (officer's specialized knowledge, even together with defendant's appearance, did not amount to particularized suspicion defendant engaged in criminal activity).[9]

The Commonwealth makes much of the fact that besides walking as he did, the defendant also continually positioned himself to keep his right side out of the officers' view. That such activity undoubtedly provides reason for vigilance does not add enough to amount to reasonable suspicion of criminal activity. "There is no suspicious conduct except as the concealment itself may generate suspicion." *Commonwealth* v. *Alvarado*, 423 Mass. 266, 270 (1996). The defendant made no furtive gestures. See *Commonwealth* v. *Holley*, 52 Mass. App. Ct.

[9]Even in the officers' experience, only fifteen percent (three or four) of their twenty-five arrests for illegal firearms involved individuals who walked in such a manner. Such a statistical indicator hardly makes *reasonable* a suspicion that criminal activity is afoot predicated on a manner of walking as opposed to other indicators. See *Commonwealth* v. *Kennedy*, 426 Mass. at 708.

at 663-665; *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. 683, 686-687 (2001). He never made a movement to his jacket pocket or his waistband, factors that in other contexts have given rise to a reasonable apprehension of danger. Compare *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 45-46 (2002) (defendant's reaching for waistband as he walked away from approaching officer justified officer's belief that his safety and that of other officers was at risk); *Commonwealth* v. *Pagan*, 63 Mass. App. Ct. 780, 782-783 (2005) (same). Indeed, the defendant's movement to retrieve identification from his adjacent pants pocket occurred in ready view of the officers.

Nor do the defendant's apparent nervousness, lack of eye contact, and shifting from side to side provide the requisite plus factors. Compare *Commonwealth* v. *Santaliz*, 413 Mass. 238, 241-242 (1992) (number of individually insufficient factors, taken together, establish basis to believe crime is ongoing); *Commonwealth* v. *Robie*, 51 Mass. App. Ct. 494, 497-498 (2001). An individual who is walking alone in a high crime area after midnight might well exhibit nervousness and anxiety when approached by two individuals unknown to him. See *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. at 688. Absent other factors not present here, the defendant's attempt to avoid contact with police, and his other arguably evasive behavior, are inadequate grounds on which to predicate reasonable suspicion that he was carrying a gun. See *Commonwealth* v. *Barros*, 435 Mass. at 178; *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 72 (1997) (attempts to avoid contact with police pertinent to reasonable suspicion determination only if other factors present beyond arguably evasive behavior).

It was the defendant's right to ignore the officers. To hold otherwise is to invite arbitrary and unequal treatment, see *Commonwealth* v. *Gonsalves*, 429 Mass. at 664, or to allow the police to "turn a hunch into a reasonable suspicion by inducing the conduct justifying the suspicion." *Commonwealth* v. *Barros*, *supra* at 178, quoting from *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981).

Beyond failing to prove that the defendant had a gun in his jacket pocket, the Commonwealth also failed to establish that there existed reasonable suspicion that he lacked a license to do

so. "[Knowledge] that someone is carrying a gun does not, without more, constitute reasonable suspicion to conduct a stop and frisk of that individual." *Commonwealth* v. *Barros, supra* at 177, citing *Commonwealth* v. *Couture*, 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990) ("mere possession of a handgun was not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun"). See *Commonwealth* v. *Alvarado*, 423 Mass. at 269-270 (reasonable suspicion not warranted simply on report of gun possession). The officers did not inquire whether he had a license until after they had frisked him and seized the weapon. The driver's license supplied to the officers was not introduced as an exhibit. Nor did the officers testify regarding the defendant's age, either as documented in his driver's license or deduced from his appearance. See *Commonwealth* v. *Barros*, 435 Mass. at 179 (Sosman, J., concurring) (defendant's apparent youth an objective basis for suspecting he is too young to be licensed).[10]

Contrary to the motion judge's conclusion that the defendant's evasive actions were "inconsistent with legal possession," the Commonwealth bears the burden of proving that at the time of the frisk the police had reasonable suspicion that the defendant possessed a firearm illegally. See *Commonwealth* v. *Franklin*, 376 Mass. 885, 898 (1978). This the Commonwealth failed to do.[11]

b. *Reasonable apprehension of danger.* We also consider and reject the contention that a frisk was permissible even absent a reasonable suspicion of criminal activity. See *Commonwealth* v. *Foster*, 48 Mass. App. Ct. 671, 680 (2000) (Jacobs, J., concurring) ("The inherent dangerousness of guns . . . is not diminished by the fact that licensed carrying of a gun is lawful"). Notably absent are factual indicia that would permit

[10]The relevant statute now permits issuance of a license to carry a firearm only to persons twenty-one years of age or older. See G. L. c. 140, § 131(*d*)(iv), as amended by St. 1998, c. 180, § 41.

[11]We have no doubt that a reasonable suspicion that the defendant was carrying a handgun illegally would have provided a basis for conducting a pat-frisk for that reason alone. See *Commonwealth* v. *Gonsalves*, 429 Mass. at 664 (where reasonable suspicion exists, "it does not take much for a police officer to establish a reasonable basis to justify . . . [a] search based on safety concerns").

the police reasonably to conclude that the defendant was armed and dangerous. Compare *Commonwealth* v. *Fraser*, 410 Mass. 541, 544-545 & n.4 (1991); *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. at 43-47. In *Fraser*, officers responding to a report of a man with a gun found a group of young men at the reported location, a high crime area. The defendant bent down behind a truck "as though to pick something up or put something down." *Commonwealth* v. *Fraser, supra* at 545. He then confronted an officer with his hands in his pocket. See *ibid.* In such circumstances, the court recognized, a patfrisk is justified even though the officers lacked sufficient information to justify an investigative stop under *Terry* v. *Ohio*, 392 U.S. 1 (1968). Police officers have a duty to investigate potential dangers to the public; and an investigating officer who comes into proximity with the defendant need not place his safety at risk. See *Commonwealth* v. *Fraser, supra* at 544 n.4.

Similarly absent is the exigency that existed in *Commonwealth* v. *Foster*, 48 Mass. App. Ct. at 673, where a report that a man was "displaying a gun," in context, provided a reasonable basis for investigating police to conclude that the described individuals were "armed and dangerous" so as to justify a protective frisk. Here, there was no such showing of imminent danger. See *Commonwealth* v. *Alvarado*, 423 Mass. at 270; *Commonwealth* v. *Barros*, 435 Mass. at 173.

Unlike in *Fraser* or *Foster*, Officers Conway and Bickerton were not investigating a report of a man with a gun, a shot, or any crime. Rather, they were pursuing a hunch that the defendant's walk suggested he was carrying a firearm. "The vice in . . . searches based on a hunch is their essentially random and arbitrary nature, a quality inconsistent, under constitutional norms . . . , with a free and ordered society." *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. 468, 472 (1996). Based on that hunch, they put themselves in such proximity to the defendant as to claim that his response placed them at risk and required a patfrisk for safety reasons. This is not the kind of emergency that justifies a protective frisk. See *Commonwealth* v. *Barros, supra* at 178 (refusing to permit police to turn hunch into reasonable suspicion by inducing conduct justifying suspicion).

Apart from the illegal search and seizure, there was no evidence that the defendant possessed a firearm or ammunition illegally. See *Commonwealth* v. *Muckle*, 61 Mass. App. Ct. 678, 685 (2004). Accordingly, we reverse the judgments of conviction and order that judgment enter for the defendant on the complaints.

*So ordered.*

BROWN, J. (concurring). I enthusiastically concur with the reasoning and result of the majority opinion. I merely write separately to articulate a few of the extraordinary, yet disturbing, instances of flagrant abuses of the constitutional rights of certain citizens by police officers. These instances of police misconduct do not serve us well and are most unwelcome in the jurisprudence of our Commonwealth.

As I agree with the carefully crafted majority opinion, I briefly mention the more obvious flaws in the dissent: (1) the "straight-arm method" is most applicable to rifles and shotguns; (2) the weighted object is equally indicative of coins, see, e.g., *Commonwealth* v. *Cullen*, 62 Mass. App. Ct. 390, 397-399 (2004); (3) although not impermissible, I see no valid reason (other than an implicit racial reference) why the officers caused the defendant to produce identification (other than by a ruse — "Yo, Dwayne"); and (4) the unsupportable conclusion, *post* at 412, that "the circumstances were sufficient to support a reasonable suspicion . . . that [the defendant] possessed [the weapon] *illegally*" (emphasis supplied).

After thirty years on the bench I think I have finally discerned an underlying rationale for "stops" of persons of color within the scope of *Terry* v. *Ohio*, 392 U.S. 1, 21 (1968). It is *motion.*[1] First, I observed a "stop" while running (*Commonwealth* v. *Bodden*, 11 Mass. App. Ct. 964, 964 [1981]), then while driving, i.e., "driving while black" (*Commonwealth* v. *Feyenord*, 445 Mass. 72, 88 [2005] [Greaney, J., concurring], cert. denied, 126

---

[1]With the notable exception of "ethnicity plus a beeper." See *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. 468, 473 (1996) (Brown, J., concurring).

S. Ct. 1369 [2006]), and now I have witnessed a "stop" of a black person while walking.[2] Also, I am always amazed at police officers' extraordinary powers of perception. Cf. *Commonwealth* v. *Benitez*, 37 Mass. App. Ct. 722, 724 n.2 (1994) (unenhanced nighttime visual acuity); *Commonwealth* v. *Ciaramitaro*, 51 Mass. App. Ct. 638, 647 (2001) (Brown, J., concurring) (exceptional visual acuity).

I can only hope that these practices will not degenerate into stops based upon "breathing while black."

RAPOZA, J. (dissenting). I respectfully dissent. Although the circumstances before us present a close case, our analysis must "take into account 'the totality of the circumstances — the whole picture.' Thus, a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief." *Commonwealth* v. *Fraser*, 410 Mass. 541, 545 (1991), quoting from *United States* v. *Cortez*, 449 U.S. 411, 417 (1981).

The majority is correct to suggest that the factors present here, taken individually, were insufficient to support a reasonable suspicion on the part of the officers that the defendant was engaged in criminal activity. Nonetheless, I conclude that when the relevant factors are considered together and not in isolation, the facts and reasonable inferences drawn therefrom provided an objective factual basis for the police officers to suspect that the defendant illegally possessed a firearm and to justify a threshold inquiry and patfrisk. See *Commonwealth* v. *Watson*, 430 Mass. 725, 729 (2000) ("Seemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry"). See also *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 44 (2002).

As noted by the majority, the area where the events occurred

[2]Curiously, the officer here testified that of the twenty-five arrests he has made for illegal firearms, only three suspects had a distinctive gait. If one does the math, that means only twelve percent of that finite subset had a noticeably peculiar manner of walking. See note 9, *supra.* This makes one wonder how many persons this officer has stopped (or has interrogated) who had a peculiar walk, but who did *not* possess a weapon. See *Commonwealth* v. *Bartlett, supra.*

is "a 'high crime' area where, on past occasions, shots had been fired and arrests had been made involving illegal handguns." *Ante* at 399. Shortly after midnight, the officers observed the defendant walking on the sidewalk with his right arm "rigid, not moving, and pressed to his side as if he were holding something." *Ibid.* As he continued to walk he favored his right side.

Based on both their training and experience, the two officers were familiar with ways that illegal firearms may be concealed and transported. "One such method — the straight arm method — employs a straightened arm pressed against the concealed weapon. Ten to fifteen percent of their twenty-five gun arrests in the previous eight months involved an initial observation of this method of carrying the firearm." *Ibid.* The manner in which the defendant conducted himself was consistent with the description of the "straight arm" method of firearm concealment.

Additionally, once engaged in conversation with the officers, the defendant "was attempting to shield his right side from their view 'as if trying to hide something.' He avoided eye contact, looked left and right, and shifted his weight from side to side." *Ante* at 400. As he reached for his identification "he continued to turn his right side from their view." *Ibid.*

Prior to the frisk, the officers observed "that the right pocket of [the defendant's] jacket was tilted to the side, as if it held a heavy object — heavier than a cellular telephone, wallet, or pack of cigarettes." *Ibid.* It was at this point that Officer Bickerton concluded that the defendant had a firearm in his jacket, and he told the defendant that he was going to patfrisk him. As the majority states, the defendant attempted to move away, and the officer grabbed his right jacket pocket, felt the handle of a handgun, and seized the weapon.

Unlike the majority, in these circumstances I conclude that prior to the announcement of the frisk, the officers had reason to suspect that the defendant illegally possessed a firearm. Although a number of the officers' observations could, considered individually, admit of an entirely innocent explanation, in combination they were sufficient to justify a reasonable suspicion on the part of the officers. See *Commonwealth* v. *San-*

*taliz*, 413 Mass. 238, 241-242 (1992) (individual factors considered in combination sufficient to support belief that criminal activity is occurring); *Commonwealth* v. *Robie*, 51 Mass. App. Ct. 494, 497-498 (2001) (suggestive factors taken in aggregate supported reasonable suspicion). The majority posits a number of other factors, absent here, that would support a determination of reasonable suspicion. Such indicia are of no moment so long as the facts actually present in the case at bar are sufficient to support a reasonable suspicion of criminal activity.

The majority suggests that the defendant's manner of walking, "like his hairstyle or clothing, is by itself too idiosyncratic to serve as the basis for a reasonable suspicion of criminal activity." *Ante* at 404. To the contrary, it was not the defendant's individualized gait that attracted the officers, but the fact that he walked with a rigid right arm pressed to his side as if he was hiding something. Moreover, they had observed the very same conduct in ten to fifteen percent of their twenty-five gun arrests in the previous eight months. What was significant to the officers was not the observation of "idiosyncratic" behavior, but conduct that was entirely consistent with the actions of persons known to conceal illegal firearms. In the circumstances, I cannot agree with the majority's conclusion that the officers were merely "pursuing a hunch that the defendant's walk suggested he was carrying a firearm." *Ante* at 407.

The majority asserts that there may have been a number of entirely innocent reasons why the defendant appeared nervous, failed to make eye contact with the officers, and shifted from side to side. Considering that the defendant appeared to be walking in such a manner as to conceal something, his other gestures, which in a different setting might appear unremarkable, took on a different cast supporting the eventual conclusion of the officers that they had reason to believe the defendant was engaged in criminal activity.

Further, it must be emphasized that Officer Bickerton did not conduct a patfrisk until *after* the officers made the additional observation that the defendant's jacket was tilted to one side, apparently holding a weighty object. In the circumstances, the officers believed that the pocket contained a firearm and it was

only then that the frisk occurred. Even if the officers did not already have a reasonable basis for suspicion, the indication of a heavy object in the defendant's pocket on the side that he had consistently shielded from the officers' gaze "tipped the scales in favor of reasonable belief when aggregated with the other nondispositive but relevant factors discussed above." *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. at 47.

Finally, considering all the factors known to the officers, especially the defendant's attempt to conceal the weapon and his other evasive actions, the circumstances were sufficient to support a reasonable suspicion not only that the defendant was in possession of a firearm, but also that he possessed it illegally. This is not a case in which the carrying of a firearm, standing alone, constituted the basis for suspicion of criminal activity. See *Commonwealth* v. *Couture*, 407 Mass. 178, 183, cert. denied, 498 U.S. 951 (1990) (mere possession of firearm is insufficient to support reasonable suspicion that it is carried illegally).

In addition, it was reasonable for the officers to believe not only that the defendant was armed, but also that he might present a danger to them, if not to others. See *Terry* v. *Ohio*, 392 U.S. 1, 27 (1968). This was especially true considering the fact that he was attempting to conceal the weapon from the officers at the time of their encounter, which was shortly after midnight in a high crime area where shots had been fired in the past and arrests had been made involving illegal handguns. In the circumstances, a reasonably prudent officer would have reason to be concerned for his safety.

"While the officer need not be absolutely certain that the individual is armed, the basis for his acts must lie in a reasonable belief that his safety or that of others is at stake." *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974). Such was the case here. Once the officers noted what appeared to be a heavy object in the defendant's pocket, Officer Bickerton told him that he was going to conduct a patfrisk for reasons of safety. See *Pennsylvania* v. *Mimms*, 434 U.S. 106, 112 (1977) (patfrisk justified as protective measure when officer observed bulge in suspect's clothing). "[W]hen all the facts are taken together, [the officers] had sufficient information to justify the protective

frisk of the defendant," which produced the illegal handgun. *Commonwealth* v. *Fraser*, 410 Mass. at 546.

For all these reasons, I conclude that the judge did not err in denying the defendant's motion to suppress the loaded handgun seized by the officers, and I would affirm the judgments of conviction.