COMMONWEALTH *vs.* JAMAL MARTIN.

No. 07-P-1411.

Suffolk. September 11, 2008. - January 15, 2009.

Present: KAFKER, BROWN, & MEADE, JJ.

Further appellate review granted, 453 Mass. 1104 (2009).

*Firearms. Constitutional Law,* Stop and frisk. *Search and Seizure,* Protective frisk. *Evidence,* Authentication of document, Curative admissibility.

A Boston Municipal Court judge properly denied the criminal defendant's motion to suppress physical evidence obtained by a police officer after a patfrisk, as well as a statement the defendant made during a telephone call at the police station, where questions (name, age, and date of birth) that followed the officer's approach of the defendant while trying to execute an arrest warrant for a third party did not constitute a seizure, nor, in the circumstances, did the officer's question whether the defendant had a weapon [530-532]; moreover, at the time the officer attempted the patfrisk, he had a legitimate reason for being in the immediate proximity of the defendant (i.e., to see if the defendant was the third party who was the subject of the warrant) and a reasonable belief that the defendant was armed and dangerous (arising from the combination of four factors: that the officer had approached the defendant in a high crime area where the officer had previously participated in firearms arrests; that the defendant had hesitated before giving his name and appeared nervous when the officer stepped out of his police cruiser to approach him; that the age and date of birth that the defendant had given were two years off, thus demonstrating that he was lying; and that the defendant had not responded to the officer's question whether he had a weapon) [532-534]. BROWN, J., dissenting.

At the trial of a criminal complaint charging the defendant with, inter alia, unlawful possession of a firearm and possession of a loaded firearm, the judge did not abuse her discretion in admitting in evidence notarized ballistics certificates, where the certificates were properly attested to, and where any deficiency in them went to the weight of the evidence and not its admissibility [534-536]; further, because the certificates were competent evidence, the judge was not required to admit the ballistician's case notes under the doctrine of curative admissibility [536-537], but even if the doctrine applied, the judge could not consider the case notes, as they were not offered in evidence [537-538].

COMPLAINT received and sworn to in the Dorchester Division

of the Boston Municipal Court Department on October 10, 2006.

After transfer to the Central Division of the Boston Municipal Court Department, a pretrial motion to suppress evidence was heard by *R. Peter Anderson*, J., and the case was heard by *Eleanor C. Sinnott*, J.

*Pamela Symmes Segre* for the defendant.

*Kristin Lombard O'Donnell*, Assistant District Attorney, for the Commonwealth.

KAFKER, J. Obviously false answers and nervous behavior by the defendant, Jamal Martin, during a brief street encounter with police led an officer to ask if he had any weapons. When the defendant failed to answer, the officer attempted to pat frisk him. The defendant pushed the officer's hands away, but the officer continued with the frisk and discovered a loaded handgun. The defendant was convicted in a jury-waived trial of unlawful possession of a firearm in violation of G. L. c. 269, § 10(*a*); possession of a loaded firearm in violation of G. L. c. 269, § 10(*n*); and assault and battery on a police officer in violation of G. L. c. 265, § 13D.[1] On appeal, he challenges his convictions on the ground that the motion judge improperly denied his motion to suppress evidence that he claims was the fruit of an illegal patfrisk. He also contends that the trial judge (who was not the motion judge) erred by admitting ballistics certificates at trial and excluding exculpatory evidence to rebut them. For the reasons set forth below, we affirm the defendant's convictions.

1. *Motion to suppress.* The motion judge made the following relevant findings of fact. On October 8, 2006, around 10:30 A.M., Boston police Officer Ismael Henriquez and his partner were patrolling the Woodrow Avenue area of the Dorchester section of Boston, a high crime area where Officer Henriquez had previously participated in drug and firearm arrests. The officers, who were wearing plain clothes and driving an unmarked car, were

---

[1]The assault and battery conviction was placed on file with the defendant's consent, and is not before us. See *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975). The defendant was also charged with unlawful possession of ammunition in violation of G. L. c. 269, § 10(*h*), but this charge was dismissed voluntarily by the Commonwealth at the conclusion of trial.

attempting to execute a warrant for the arrest of a juvenile who lived in the neighborhood. In the process, they saw a young man, the defendant, wearing a sweatshirt with a hood pulled up around his face. The defendant was walking toward Woodrow Avenue. While they could not see his face, the officers thought that the defendant might be the juvenile they were looking for.

They made a U-turn and drove next to the defendant, who ignored them. At this point, the officers still could not see his face. They rolled down the window, identified themselves as police officers, and asked the defendant his name. After some hesitation he replied, "Jamal Daly," which was not the name of the juvenile they were seeking. Also, the defendant was taller and stockier than that juvenile.[2] The officers asked the defendant for his birth date. He told them it was "September, 1987." They then asked him how old he was and he replied, "Seventeen." Because the age and date did not match,[3] the officers believed the defendant was lying about at least one of his answers.

At that point, Officer Henriquez stepped out of the vehicle and approached the defendant while his partner remained in the car. The defendant was nervous and took a few steps backward. Officer Henriquez could now see the defendant's face and knew he was not the wanted juvenile. The officer then asked the defendant if he had any weapons. When the defendant did not answer, Officer Henriquez attempted to pat frisk him.[4] The defendant pushed the officer's hands away. Officer Henriquez told the defendant to calm down and continued with the frisk, during which he felt a hard object that turned out to be a loaded gun. Officer Henriquez handcuffed the defendant and arrested him. While booking him, the police allowed the defendant to make a telephone call, during which they overheard him say that he had "just been locked up for the gun I found." Additional facts from the record will be set forth as necessary.

The defendant argues on appeal that the judge improperly

---

[2]It is not clear from the findings how much taller or stockier the defendant was than the juvenile, nor when the officers realized the discrepancy.

[3]If the defendant had been born on the date he gave the officers, he would have been nineteen, not seventeen.

[4]The officer testified at the suppression hearing that he told the defendant that for safety, he (the officer) was going to pat frisk him.

denied his motion to suppress evidence that he claims was the fruit of an illegal patfrisk. Prior to trial, the defendant made a motion to suppress the gun and bullets seized by the police and the statement he made during booking. The defendant argued that the police had no constitutional basis to search him. After an evidentiary hearing on December 11, 2006, a Boston Municipal Court judge denied the motion. The judge determined that the police had no constitutional basis to search the defendant prior to the defendant's pushing Officer Henriquez's hands away, but concluded that the push "provided probable cause to arrest the defendant for the crime of assault and battery." The judge observed that "[i]f suspects were legally permitted to resist searches or arrests they believed illegal, chaos and violence would supplant the rule of law." The judge further observed that, once there is probable cause to arrest, the police "may search a suspect for weapons or for evidence of the crime for which the arrest is made."

In reviewing a motion to suppress, the judge's findings of fact are "binding in the absence of clear error." *Commonwealth* v. *Alvarado*, 420 Mass. 542, 544 (1995). However, we "independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Gentile*, 437 Mass. 569, 573 (2002), quoting from *Commonwealth* v. *Eckert*, 431 Mass. 591, 593 (2000). While we affirm the judge's ruling, we do so on different grounds.[5] See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997)

---

[5]The motion judge concluded that there was no basis to justify a search of the defendant until he pushed the officer's hands away. Because we conclude that the patfrisk was justified on other grounds, we need not consider, as the motion judge did, whether the defendant's pushing away Officer Henriquez's hands provided probable cause to arrest justifying the subsequent patfrisk. See *Commonwealth* v. *Moreira*, 388 Mass. 596, 601 (1983) ("in the absence of excessive or unnecessary force by an arresting officer, a person may not use force to resist an arrest by one who he knows . . . is an authorized police officer, engaged in the performance of his duties, regardless of whether the arrest was unlawful in the circumstances"); *Commonwealth* v. *Gomes*, 59 Mass. App. Ct. 332, 341-343 (2003).

The defendant argues that the "deflective movement of pushing Officer Henriquez's hands away" was not sufficiently separate from what he claims was an illegal patfrisk to dissipate the taint of that alleged illegality. The Supreme Judicial Court has held that "the commission of a new, 'unrelated' crime after an illegal [search or] arrest may provide the basis for a valid

("An appellate court is free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings").

Based on the judge's factual findings we conclude that the defendant was not seized until the officer attempted the patfrisk. At that point the officer had a legitimate reason for being in the immediate proximity of the defendant and a reasonable belief that the defendant was armed and dangerous. Therefore, the motion to suppress the gun and ammunition found pursuant to the patfrisk was properly denied.

"A person is seized by the police only when, in light of all of the attending circumstances, a reasonable person in that situation would not feel free to leave." *Commonwealth* v. *DePeiza*, 449 Mass. 367, 369 (2007). In the instant case, the officers approached in an unmarked vehicle, without activating blue lights or sirens. Contrast *Commonwealth* v. *Smigliano*, 427 Mass. 490,

---

arrest," and therefore a search incident to that arrest. *Commonwealth* v. *Borges*, 395 Mass. 788, 797 (1985), citing *Commonwealth* v. *King*, 389 Mass. 233, 245 (1983) (although troopers had exceeded the scope of a permissible initial inquiry, probable cause to arrest then arose after the driver of the car shot at the officers). See *Commonwealth* v. *Holmes*, 34 Mass. App. Ct. 916, 917-918 (1993) (even if there was no proper basis to stop the car, the defendant's slamming of the car door into an officer created "a completely new situation so attenuated from the initial encounter as to dissipate wholly . . . [the] initial taint"); *Commonwealth* v. *Mock*, 54 Mass. App. Ct. 276, 284 (2002) (defendant hurled a video cassette recorder at an officer); *Commonwealth* v. *Coleman*, 64 Mass. App. Ct. 558, 562 (2005) (defendant engaged police in a dangerous automobile chase); *Commonwealth* v. *Kolodziej*, 69 Mass. App. Ct. 199, 202 (2007) (reckless operation of a motor vehicle). Contrast *Commonwealth* v. *Borges*, *supra* (motion to suppress allowed where, although intervening acts occurred, they were not "sufficiently independent, in nature and temporal proximity" to justify the subsequent arrest; the defendant fled on foot, struggled with officers, and attempted to dispose of evidence); *Jones* v. *State*, 745 A.2d 856, 872 (Del. 1999) ("[T]he crime of resisting an illegal arrest does not necessarily carry with it the right to justify any search incident to an actual arrest for the crime of resisting an illegal arrest. Otherwise there would be significant potential for official abuse"); *State* v. *Beauchesne*, 151 N.H. 803, 818 (2005) ("in order to protect important State constitutional rights, it is 'logical and necessary' to apply the exclusionary rule to situations where the initial seizure is unlawful and the defendant then violates [the law by resisting arrest]"); *State* v. *Alexander*, 157 Vt. 60, 63-64 (1991) (not all intervening crimes will remove the taint of an illegal stop, only ones sufficiently serious to be "distinct").

491-492 (1998) ("a reasonable person, on the activation of a police car's blue lights, would believe that he or she is not free to leave"). While there were two officers present, only Officer Henriquez stepped out of the vehicle, and he did not obstruct the defendant's movement. Compare *Commonwealth* v. *De-Peiza*, 449 Mass. at 370 (no seizure even where two officers stepped out of the car and stood on each side of the defendant). Also, neither officer ordered the defendant to stop or to answer the questions he posed. See *ibid.* (relying in part on the fact that the officers did not order the defendant to stop or to answer their questions in concluding there was no seizure). Contrast *Commonwealth* v. *Barros*, 435 Mass. 171, 172, 176 (2001) (defendant was seized when an officer approached the defendant after he ignored a request to talk and then said, "Hey you. I wanna talk to you. Come here"). Nor did the officers draw their weapons or touch the defendant prior to the patfrisk. See *Commonwealth* v. *Pimentel*, 27 Mass. App. Ct. 557, 560 (1989) (explaining that "the display of a weapon by an officer [and] some physical touching of the person of the citizen" are examples of additional circumstances that support a finding of a seizure).

In this context, the questions that followed the officers' approach regarding name, age, and date of birth did not constitute a seizure. See *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 388, cert. denied, 515 U.S. 1146 (1995) (no seizure where an officer approached the defendant in a public parking lot and asked questions about his identity); *Commonwealth* v. *DePeiza*, 449 Mass. at 370 (no seizure when officers asked for identification and held it during a "brief conversation"). The Supreme Judicial Court has recognized that "the police do not effect a seizure merely by asking questions unless the circumstances of the encounter are sufficiently intimidating that a reasonable person would believe he was not free to turn his back on his interrogator and walk away." *Commonwealth* v. *Fraser*, 410 Mass. 541, 544 (1991). See *Commonwealth* v. *Murdough*, 428 Mass. 760, 763 (1999) ("officers may make inquiry of anyone they wish . . . so long as they do not implicitly or explicitly assert that the person inquired of is not free to ignore their inquiries").

Although more significant, the additional question whether the defendant had a weapon is likewise not enough in these

circumstances to seize the defendant. In *Commonwealth* v. *Fletcher*, 52 Mass. App. Ct. 166, 170 (2001), after observing "three men who were engaging in the disorderly and unorthodox conduct of pounding on the side of a stopped bus in a public transit station crowded with people during the evening rush hour commute," an officer called the men over to talk to him, and as they approached he asked them if they had any weapons. When they did not answer, he pat frisked them. *Id.* at 167. In that case, we concluded that "stopping and stepping out of a cruiser that was properly patrolling a public transit station, calling over to the men, approaching them, and asking about a weapon . . . did not constitute a stop or seizure."[6] *Id.* at 170. See *United States* v. *Lockett*, 406 F.3d 207, 209, 211 (3d Cir. 2005) (no seizure where officers told the defendant they were "looking for contraband including narcotics, large sums of money, *guns, and other weapons* [and] asked [him] if he had any of these items in his possession" [emphasis supplied]).

The decision to pat frisk a defendant, however, transforms the encounter. At that point, there must be at a minimum "some legitimate basis for the officer being in immediate proximity to the person," and the officer must reasonably believe that the individual is armed and dangerous. *Commonwealth* v. *Fraser*, 410 Mass. at 544 n.4. See *Commonwealth* v. *Isaiah I.*, 450 Mass. 818, 824 (2008); *Commonwealth* v. *Knowles*, 451 Mass. 91, 97 (2008).

We conclude that Officer Henriquez had a legitimate reason for being in the immediate proximity of the defendant because the officer was attempting to apprehend a wanted juvenile who lived nearby, and he stopped the defendant to see if he was that individual. See *Commonwealth* v. *Fraser, supra* at 545 n.4 (officer was legitimately in the immediate proximity of the defendant when he came into contact with him while investigating a report of an armed man at that location). Although the officer had realized that the defendant was not the juvenile immediately before he asked the question about weapons, the defendant had in the meantime given the officer inconsistent answers and behaved nervously.

---

[6] We did not reach the question in *Fletcher* regarding whether the patfrisk was constitutionally justified. *Commonwealth* v. *Fletcher*, 52 Mass. App. Ct. at 171-172.

The only issue that remains is whether Officer Henriquez had a reasonable belief that the defendant was armed and dangerous after the defendant did not respond to the question about weapons. We consider this a close question, but conclude that the officer did have a reasonable belief in these circumstances. The Supreme Judicial Court has observed that "it does not take much for a police officer to establish a reasonable basis to justify . . . [a] search based on safety concerns." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 664 (1999). Also, "in applying hindsight to an officer's actions, an appellate court is mindful that, as shown by many tragic endings to threshold police inquiries, 'the answer might be a bullet.' " *Commonwealth* v. *Rivera*, 67 Mass. App. Ct. 362, 365 (2006), quoting from *Commonwealth* v. *Silva*, 366 Mass. 402, 407 (1974). See *Terry* v. *Ohio*, 392 U.S. 1, 33 (1968).

The combination of the following four factors produced the necessary reasonable belief that the defendant was armed and dangerous.[7] See *Commonwealth* v. *Fraser*, 410 Mass. at 545 ("a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief"). First, the officers approached the defendant in a high-crime area where Officer Henriquez had previously participated in firearm arrests. See *ibid.* Second, the defendant hesitated before telling the officers his name and appeared nervous when Officer Henriquez stepped out of the car and approached him. Compare *Commonwealth* v. *DePeiza*, 449 Mass. at 371 (nervous behavior is a factor that can contribute to a reasonable belief that an individual is "committing the crime of carrying an illegal firearm"). Third, the age and date of birth that the defendant gave the officers were two years off, thereby demonstrating the defendant was lying to the officers. See *Commonwealth* v. *Narcisse, ante* 406, 410 (2008) (defendant's statement that he was from the town where a murder had occurred the previous night, together with his "apparently false statement that he was coming from 'the store,' " raised the officer's suspicion).

---

[7]We recognize that there were also factors that weighed against a reasonable belief that the defendant was armed and dangerous. For example, the time of day, which was in the morning, the absence of a furtive movement such as reaching for his waist, and the absence of flight. However, the factors that were present, when taken together, were nevertheless sufficient.

Fourth, the defendant's silence in response to Officer Henriquez's asking him if he had any weapons contributed to the officer's reasonable belief that the defendant was armed and dangerous. The ambiguity left by the defendant's silence in response to this question, particularly when he had answered the previous questions, may be considered a factor by the police in determining whether the defendant is in fact armed and dangerous.[8] See *Commonwealth* v. *Knowles*, 451 Mass. at 100 ("If the officer had asked rather than ordered [the defendant] to step away from the area to speak to him about the matter, and if [the defendant] had declined to do so, that fact would have legitimately heightened the officer's concern that [the defendant] posed a danger to his safety"). See also 2 LaFave, Search and Seizure § 3.6(f), at 364 (4th ed. 2004) ("the better view is that refusal to answer is one factor which an officer may consider, together with the evidence that gave rise to his prior suspicion, in determining whether there are grounds for an arrest"). Contrast *Commonwealth* v. *Barros*, 435 Mass. at 178 (defendant's "breaking eye contact with the officer and his refusing to answer the officer's initial questions . . . cannot provide reasonable suspicion . . . [as] [i]t was the defendant's right to ignore the officer").

In sum, in these circumstances, the patfrisk was justified.

2. *Admission of the notarized ballistics certificates.* The defendant next claims that the trial judge erred by admitting the notarized ballistics certificates in evidence. At trial, the Commonwealth offered the firearm and ammunition certificates as exhibits. The certificates stated that, in the ballistics expert's opinion, the weapon and the bullets found on the defendant met the statutory definitions of "firearm" and "ammunition."[9] Both of these certificates were executed and notarized in accordance with the provisions of G. L. c. 140, § 121A. The defendant objected to the admission of this evidence because the copies

_____

[8]We also note that both of the ages provided by the defendant rendered him too young to own a firearm legally. General Laws c. 140, § 131(*d*)(iv), prohibits an individual under age twenty-one from obtaining a firearm license.

[9]The expert therefore certified that the gun was capable of discharging a shot or bullet and the bullets were "designed for use in any firearm, rifle or shotgun." See definitions of "[a]mmunition" and "[f]irearm" in G. L. c. 140, § 121, as appearing in St. 1998, c. 180, § 8.

that the Commonwealth had provided to him during discovery were not notarized.[10] The defendant, however, did not mark the discovery copies for identification or offer them in evidence.

On appeal, the defendant argues that the certificates should have been excluded because the Commonwealth failed to provide him with notarized copies during discovery and because the unnotarized copies he did receive during discovery called into question the authenticity of the certificates admitted at trial.[11] We conclude that the judge did not abuse her discretion in admitting the notarized certificates.

The ballistics certificates entered in evidence at trial were properly attested to and were therefore correctly admitted by the judge. To whatever extent the unnotarized discovery copies may have undermined the authenticity of these certificates, any deficiency went to the weight of the evidence and not its admissibility. Cf. *Commonwealth* v. *Westerman*, 414 Mass. 688, 700 (1993) (concluding that "any procedural or administrative errors [in a drug analysis certificate] affect only the weight of the evidence" and not its admissibility). Furthermore, we agree with the Commonwealth that it disclosed the substance of the certificates to the defendant in a timely manner and that the delay in providing the notarized copies had no adverse consequences on the defendant's ability to prepare his case; the defendant does not argue that there is any substantive difference between the notarized and unnotarized certificates, nor do we observe any such difference. See *Commonwealth* v. *Emerson*, 430 Mass. 378, 380-381 (1999), cert. denied, 529 U.S. 1030 (2000), quoting from *Com-*

---

[10]The defendant also argued that a typographical error in the certificates, stating that the ammunition and firearm were submitted to be tested on "January 1st in the year of 1900," called into question "the entire nature of the certificate[s] [themselves]." The defendant has abandoned this argument on appeal.

[11]The defendant also argues in his brief that "[e]ven if there is no error in the judge's discretion on this issue, the actual ballistic tests' findings were never specified at trial and thus proof of the defendant's guilt was incomplete." The defendant did not raise this claim below, but even if he had, it is without merit because the certificates were admitted into evidence and their contents need not be additionally read into the record or otherwise admitted through live testimony. See *Commonwealth* v. *Nieves*, 43 Mass. App. Ct. 1, 4 (1997) (admission of the ballistics certificates is an alternative to the testimony of persons familiar with the guns or persons who handled the gun).

*monwealth* v. *Baldwin*, 385 Mass. 165, 175 (1982) ("Even where there has been insufficient disclosure, we look to see 'whether, given a timely disclosure, the defense would have been able to prepare and present its case in such a manner as to create a reasonable doubt that would not otherwise have existed' ").

3. *The ballistics case notes.* The defendant's final claim of error concerns the ballistician's case notes that accompanied the ballistics certificates. During the defendant's cross-examination of Officer Henriquez, the following exchange took place:

> *Q.:* "Were you there present when [the firearm] was tested?"
>
> *A.:* "No, I was not."
>
> *Q.:* "Did you read the ballistician's report?"[12]
>
> *A.:* "Yes, sir."
>
> *Q.:* "The way that gun was found that day it could not be operated, correct; it could not fire those bullets, correct?"
>
> *A.:* "If that's what it says —"
>
> PROSECUTOR: "Objection."
>
> THE COURT: "Overruled."
>
> *Q.:* "The way the gun was found that day it couldn't be fired according to the ballistician's report, correct?"
>
> PROSECUTOR: "Objection. It doesn't say that."
>
> THE COURT: "No. He can testify as to what he knows. Does it say that or not, or do you know?"
>
> *A.:* "Well, there's another certification in there."
>
> *Q.:* "I'm not talking about the certification. I'm talking about his written report?"

---

[12]Defense counsel is presumably referring to the document entitled "Ballistic Unit Case Notes" prepared by the ballistician who prepared the ballistics certificates.

A.: "Correct."

DEFENSE COUNSEL: "I have no further questions."

The defendant, however, did not seek to admit the case notes in evidence, nor did he present any expert witnesses on the question.

During the defendant's closing argument, counsel argued, "We know from the police officer's testimony that the ballistician himself admitted that the gun was not fireable in the condition it was found on the defendant." At that point, the judge interrupted him because the judge did not believe the police officer had given this testimony. The judge also correctly pointed out that the case notes were not in evidence.

On appeal, the defendant argues that the case notes should have been admitted under the doctrine of curative admissibility. "The curative admissibility doctrine allows a party harmed by incompetent evidence to rebut that evidence . . . if the original evidence created significant prejudice." *Commonwealth* v. *Ruffen*, 399 Mass. 811, 813-814 (1987). The defendant claims that the notarized ballistics certificates were incompetent evidence, and therefore, he should have been allowed to rebut them by entering the ballistician's case notes, which he claims contain exculpatory evidence. Because, as discussed *supra*, the ballistics certificates were competent and properly admitted in evidence, the curative admissibility doctrine does not apply.[13] Moreover, even if the doctrine had applied, the defendant did not properly

---

[13]We are also unconvinced that the ballistician's case notes would establish that the gun found on the defendant was not a "loaded" firearm. Officer Henriquez testified that the ammunition described in the ballistician's certificate was found in the gun taken from the defendant. The ballistician's certificates opined that the weapon found on the defendant was a firearm and that the "two rounds of 7.65 ammunition" met the definition of "ammunition" in G. L. c. 140, § 121. While it appears from the ballistician's notes that the bullets and gun seized from the defendant were not capable of firing together, the expert concluded that they nevertheless individually met the statutory definitions of "firearm" and "ammunition." We note that when the Legislature defined the term "loaded" firearm in 2006, it adopted the same definition of "ammunition" as that found in G. L. c. 140, § 121. See G. L. c. 269, § 10(*o*), inserted by St. 2006, c. 48, § 7 (a firearm is "loaded" when "ammunition is contained in the weapon or within a feeding device attached thereto," and the ammunition need only be "designed for use in *any* firearm" [emphasis added]). Compare *Commonwealth* v. *Bartholomew*, 326 Mass. 218, 220 (1950) ("While

offer the notes into evidence.[14] The trial judge could not consider something that was never properly before her. *Commonwealth* v. *O'Brien*, 423 Mass. 841, 848-849 (1996).

*Judgments affirmed.*

BROWN, J. (dissenting). I respectfully dissent, as there is, in my view, an unclear line between *Commonwealth* v. *Barros*, 435 Mass. 171 (2001), and *Commonwealth* v. *DePeiza*, 449 Mass. 367 (2007), and, in any event, the factual circumstances in the case before us exceed even the dictates of the *DePeiza* decision.

In the factual scenario here we have a young man walking down the street at 10:30 in the morning, who is nervous upon being questioned by the police. His inconsistent answers were not germane to any crime being investigated, nor were there any visible signs that he was carrying a weapon, such as an unusually heavy pocket, or an odd gait. He did not make any furtive movement. Only *after* the police had ascertained that he was not the person they were seeking to apprehend was he asked whether he had a gun.[1] Thus, even under the teachings of *Commonwealth* v. *Fraser*, 410 Mass. 541 (1991); *Commonwealth* v. *DePeiza, supra*; *Commonwealth* v. *Fletcher*, 52 Mass. App. Ct. 166 (2001); *Commonwealth* v. *Narcisse, ante* 406 (2008); and *Commonwealth* v. *Jackson, ante* 411 (2008), there simply was not enough here to question the defendant further after the police realized he was not the person they were looking for. This is a case where "the police . . . turn[ed] a hunch into a reasonable suspicion by inducing the conduct justifying the suspicion." *Commonwealth* v. *Barros*, 435 Mass. at 178.

---

it may be conceded that a weapon designed for firing projectiles may be so defective or damaged that it has lost its initial character as a firearm, . . . this character is not lost when a relatively slight repair, replacement, or adjustment will make it an effective weapon").

[14]We reject the defendant's argument that the notes were in evidence because they came in through Officer Henriquez's testimony. It was defense counsel who sought, through his questions, to interject the notes into the trial without actually introducing the notes. The officer's testimony was minimal and unclear in relation to the notes.

[1]I note that requiring an individual to respond to a specific question may in certain circumstances precipitate self-incrimination problems.

I am compelled to add an admonition about the current state of the law. The resolution of this category of cases apparently turns on the question whether the citizen had a gun. That may not be the only factor, but it certainly seems to be the controlling one. If it is not, we should pat frisk all travelers *walking* (or stopping) on the street, or at any intersection in a so-called high crime area (which I suspect is an area situated in most cities and towns). We already know even under *Terry* v. *Ohio*, 392 U.S. 1 (1968), that "running" and "straight-arm" walking are sufficiently indicative of reasonably suspicious behavior to justify a patfrisk. See *Commonwealth* v. *DePeiza*, 66 Mass. App. Ct. 398, 408-409 (2006) (Brown, J., concurring), *S.C.*, 449 Mass. 367 (2007). In sum, we have here another example of the troubling tension that exists between the responses of law enforcement personnel to the dangers of illegal weapons on the streets of our cities and towns and respect for and adherence to the commands of the Fourth Amendment to the United States Constitution. My hope, however, is that the Fourth Amendment does not become "an inconvenient truth."